## MATHEWS v. NORTH TEXAS TRACTION CO. (No. 6765.)*

(Court of Civil Appeals of Texas. San Antonio. May 31, 1922. Rehearing Denied June 28, 1922.)

1. Carriers ⚙═320(26)—Evidence held to raise jury question as to street railroad's negligence in setting down passenger.

Testimony by plaintiff and another witness that a street car started while plaintiff's decedent was alighting therefrom, though contradicted by several disinterested witnesses and containing inconsistencies and improbabilities, is sufficient to take to the jury the issue of the negligence of the street railroad company.

2. Death ⚙═103(2)—Evidence of cause of passenger's death held insufficient for jury.

In an action to recover damages for the death of plaintiff's mother, evidence held insufficient to show that the injuries received by her mother when she fell when alighting from a street car, but which produced no visible marks, and of which the mother did not complain more than a few days thereafter, contributed to cause the death of the mother 13 months after the accident, so that a directed verdict for the street car company was proper, though there was sufficient evidence to take the issue of its negligence to the jury.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by Mrs. Nannie Mathews against the North Texas Traction Company, in which Mrs. W. M. Wallace was substituted as plaintiff after the death of the original plaintiff. Judgment for defendant on directed verdict, and plaintiff appeals. Affirmed.

Graves & Houtchens & Clark, of Fort Worth, for appellant.

Capps, Cantey, Hanger & Short, Alfred McKnight and Julian B. Mastin, all of Fort Worth, for appellee.

SMITH, J. Mrs. Nannie Mathews, a widow, brought this action against the traction company for damages for personal injuries, alleging that on April 15, 1918, while she was alighting from one of. the company's street cars in the city of Fort Worth, the car was suddenly started, throwing her to the ground, and injuring her. Thirteen months later, and before the suit was tried, Mrs. Mathews died. Her only daughter, Mrs. W. M. Wallace, substituted herself as plaintiff, filed an amended petition, and asked for judgment for $5,800 actual and $7,000 exemplary damages, alleging that the injuries received in the accident caused or contributed to her mother's death. Trial resulted in a directed verdict for the defendant company, and from a judgment entered on the verdict Mrs. Wallace has appealed.

The record presents a case quite remarkable in some of its aspects. At the time of the alleged accident Mrs. Mathews was 75 years old, and had been unable to walk, except upon crutches, for 5 or more years, on account of injuries received in a railroad accident. In spite of this handicap, however, she spent her days peddling pencils and shoe strings on the streets of Fort Worth—a familiar and always pathetic picture incident to larger cities. Her daughter testified that in this way her mother made from $3.50 to $13 a day, out of which she maintained a home for her daughter and herself, paid the household and her own expenses, supplied her daughter with food and clothes, and gave her $2 a day in money. They resided in an apartment on Hemphill street at Railroad avenue. On the occasion of the accident the mother and daughter were in the street car on their way home, after having spent the day in the city. When the car stopped at their corner, they started to alight. The great preponderance of the evidence was that the street car conductor, a young married man, just 20 years old, took hold of Mrs. Mathews' arm and assisted her down the car steps to the ground, where her daughter, who had preceded her out of the car, was awaiting her with her crutches, and some packages collected in the day's shopping. By the same preponderance of ·the evidence, it was shown that after Mrs. Mathews was clear of the car steps, out in the street, and was adjusting herself to her crutches, the car moved on, and after it had proceeded a few feet Mrs. Mathews sank or fell to a sitting posture on the ground, or, as one of the passengers standing on the rear platform expressed it, "it looked to me like the

⚙═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction October 18, 1922.

old lady was just a little bit tired, and wanted to sit down." The conductor, also standing on the rear platform, saw the mishap to the lady, and, signaling the car to stop, opened the door, swung off, and rushed back to assist her, but, as he was in the act of raising her up, her daughter began cursing and abusing him in "dirty and awfully vulgar language," according to the undisputed testimony of one of the passengers, attacked him first with her fists, and then with her mother's crutches, both of which she broke in pieces over his head, back, and shoulders. When the crutches were broken, she used the heavier end of one of them as a cudgel and continued to belabor the conductor, fracturing the bone in one of his hands, and otherwise bruising him up. At this juncture the conductor ceased his efforts to raise the prostrate woman, retired to his car, took the names of some of the passengers as witnesses, and proceeded on his run, at the end of which he was obliged to lay off and go home for repairs. Bystanders carried Mrs. Mathews to a nearby house—whether this was made necessary because of her condition, or because her crutches had been destroyed, was not shown—and a physician was called to attend her. According to the testimony of her daughter, Mrs. Mathews was confined to her bed for about 6 weeks, when she got up and undertook to resume the peddling of shoe strings and pencils, by going about the streets in a wheel chair, which was manipulated by her daughter. After a few such trips, however, she gave this up, and about five months later, in November, took to her bed, to which her daughter testified she was confined until her death late in the following May, at the age of 76 years.

[1] Appellant complains of the action of the trial court in directing a verdict against her, contending first that the evidence was such as to raise an issue that should have gone to the jury upon the question of negligence. We have in general terms set out the substance of appellee's evidence upon this phase of the case. Three disinterested witness, two passengers and a lady residing across the street who witnessed the accident, supported the testimony of the conductor that the car was not moved until Mrs. Mathews had gotten off and was standing clear of the car, out in the street, and that after the car had moved a few feet she sank or fell to the ground. Of course this evidence, if true, acquits appellee of the charge of negligence. Appellant, Mrs. Wallace, relies upon her own testimony and that of a passenger named Black to overcome this evidence and establish negligence. Black testified that Mrs. Mathews was standing on the bottom step, holding her crutches in position, with her feet on the step and the crutches set on the ground, or in the act of being placed on the ground, when the car moved off, and she fell; while Mrs. Wallace testified that she preceded her mother out of the car, taking the crutches with her, and leaving her mother standing on the top step, and that while her mother was still standing on the top step, without her crutches, the conductor maliciously signaled the motorman to proceed, the car started, and Mrs. Mathews was thus thrown to the ground. It will be seen that the testimony of Mrs. Wallace and Black was flatly and circumstantially contradicted by the testimony of all the other witnesses in the case, and their own testimony conflicted radically in all the details of the transaction, although the effect of the testimony of each was that Mrs. Mathews had not actually left the car when it started, and that her fall resulted from that movement. A marked uncertainty of fact pervaded the whole of Black's testimony, upon material as well as immaterial matters. He was uncertain as to the name of his business partner in Fort Worth, as to the location of his office there, and of his residence, and seemed unable to explain the process by which he appeared as a witness in the case, and was likewise vague as to his recollection of the facts of the accident. Mrs. Wallace did not undertake to explain her verbal or physical attack on the conductor, and at first professed not to remember that attack, which she finally admitted, but did not explain. But, while these matters render the testimony of these witnesses extremely improbable, as opposed to the great preponderance of the evidence in the case, they nevertheless go rather to the credibility of the witnesses and the weight to be given their testimony, the determination of which is peculiarly the province of a jury. If the right of Mrs. Wallace to recover depended alone upon the question of negligence, we would feel obliged to reverse the judgment, and relegate the issue of negligence back to the jury.

Mrs. Wallace based her right to recover in the case upon the contention that the injuries resulting from the accident, chargeable to the traction company's negligence, caused or contributed to her mother's alleged premature death; that her mother was her "sole support"; that out of the money her mother earned in peddling pencils and shoe strings in the streets of Fort Worth from day to day the latter paid her $2 a day and supplied her with her food and clothes; that, according to the American Experience Mortality Tables, her mother had a life expectancy of 6.3 years, during which period it is contended she would have continued to support her daughter, as before. As stated, at the time of the accident the widowed mother was 75 years old, and was so badly crippled she could not walk except on crutches, and had been in this condition for several years. The daughter, an only child, was an unincum-

bered widow, 43 years old. She was a trained nurse, in which profession she said she had had a wide experience. She was capable and intelligent, was above the average in size, and the record here certainly warrants the inference that she was robust and vigorous—so much so, it appears, that the crutches, which were substantial enough to support the mother in peddling trinkets about the streets to maintain her daughter, made such frail cudgels when wielded by the latter that they readily broke in pieces over the head and shoulders of the luckless street car conductor.

[2] In support of the contention that the injuries received in the accident caused or hastened the death of her mother, Mrs. Wallace depended upon her own testimony and that of her mother's physicians, four of whom had treated her in recent years, but only two of whom were called to testify, one by appellant and the other by appellee. No witness, doctor or layman, testified directly in support of this contention. Mrs. Wallace testified that her mother was in good health before the accident, considering her age; that her mother fell on her back; was "hurt" on the right side and back; was confined to her bed for about six weeks after the accident; could not get up without help; was never able to again "engage in business"; could not use her right arm for the pain; her right shoulder and hip were hurt; was confined to her home practically all the time after the accident. Cross-examined, she testified:

That her mother "never was up after the accident. She was up town; yes, sir; but I brought her up here in a wheel chair. I went and bought her a wheel chair, one of these little chairs, you know. She went out one or two times after this accident, to sell things, in this wheel chair; she went out three different times, with me rolling that chair; she could not walk at all."

Nothing was shown as to Mrs. Mathews' condition from the time she got up, six weeks after the accident, until she went back to bed in November, a period of about five months. Mrs. Wallace testified further that her mother went back to bed in November, and remained there until she died, late in the following May; that "she could only move her right shoulder or hip or lower limbs a very little a day or two before her death, and they were cold"; that she had a "stroke" two nights before her death, rendering her speechless, and she lingered until two days later, and died.

On the day of the accident Mrs. Wallace called Dr. Miller, who found Mrs. Mathews complaining of pain in her right shoulder and hip, and, while there were no bruises or anything that he could see, she seemed to be tender in spots on her shoulder and hip, "as best I could tell"; that he made a second visit to her two or three days later, and found her still complaining of soreness over the right shoulder and hip and leg. Except for these two visits of Dr. Miller, it is not shown that any other doctor visited or treated her for these injuries. Dr. Miller, however, although somewhat persistently coaxed by appellant, who put him on the witness stand, declined to express an opinion, based either upon his examinations of Mrs. Mathews, or upon hypothetical questions propounded to him by appellant, that the injuries described caused, or had anything to do with, her death.

Dr. Givens, for appellee, testified that he had treated Mrs. Mathews occasionally during the last three or four years of her life, examined her within two or three days of her death, and issued her death certificate; that he never saw anything indicative of the alleged injuries, and did not remember of her complaining of those injuries; that he did not remember any particular ailment he treated her for, but that she would just be "under the weather" and come to him for treatment, and he did not even charge her for her visits; that she had been in feeble health for several years, and when he examined her just before her death she was suffering from "a senile condition; I mean by that she was aged, and in a weak condition;" that, taking into consideration the feeble condition she was in for the last three or four years, and his knowledge of her condition during that time, and the condition she was in when he saw her just before her death, it was his opinion that her death was due "just to a senile condition." In response to hypothetical questions, he declined to express an opinion that the accident had anything to do with her death, but insisted it was due to old age, or senility.

Dr. Kuykendall was called as a witness for appellant. He had never treated, examined, or seen Mrs. Mathews, and was offered only as an expert. Appellant propounded hypothetical questions designed to elicit from him an opinion that Mrs. Mathews' death was caused or contributed to by the accident. The case described in these questions was not the case made by the record, but even as they were propounded this doctor did not directly answer them. His answer was equivocal, and when given was based upon an exaggerated hypothesis in connection with his assumption of additional vital facts not disclosed, but negatived, by the record, and was therefore of no value to the inquiry.

It was in this state of the record that the trial court directed a verdict against appellant, as we think it was plainly its duty to do, for the reason that there was no evidence that Mrs. Mathews' death was caused or hastened by the injuries she received in

the accident. A finding that there was any connection between the two events could have had no basis except in the merest speculation, conjecture, and inferences, none of which could have been more reasonable than the inference that her death came as a natural consequence of her years of feeble health, her crippled limbs, her advanced age, the last few years of which were spent in hobbling about the streets on crutches engaged in the pitiful subterfuge of peddling pencils and shoe laces, the ominous "stroke" that marked the beginning of the end; that, becoming old, worn, broken in body, she had reached the limit of endurance, and succumbed to the inexorable laws of nature.

Appellant, through her able counsel, has most eloquently invoked the support of the state and federal Constitutions, as well as our statutes and decisions, which "have so fixed and established within the very vitals of our system of jurisprudence the principle that every citizen within the confines of this republic is guaranteed a fair and impartial trial by a jury of her peers." She calls to her aid the venerable Alamo and the immortal spirits of Travis, of Bowie, and of Crockett, in her demand to have her cause passed upon by a jury. The invocation and the call are delightfully impressive and persuasive, and if hearkened to here, and heeded in the court below, and in that way find their way to a jury, they might become convincing, as well. But we think appellant has been given every possible consideration to which she has shown herself entitled under the law, in the court below as well as here. And while, by slightly stretching it, the principle of the right of trial by jury might be made to embrace her contention that the negligence of appellee caused her mother to fall, we think it would be doing unwarranted violence to that principle to enlarge it so as to encompass the unsupported and improbable contention that the fall caused or even hastened the death of Mrs. Mathews. By her own contention appellant concedes that, although herself a strong and capable woman, trained in a profession, unincumbered, barely of middle age, and in robust health, she passed her days amid the comforts of home, while permitting her aged and crippled mother to hobble on crutches about the streets of the city, day after day and year after year, peddling pencils and strings in order to make a living for the two and pay her daughter a daily cash bonus besides. The fact that appellant in this way coined her mother's misfortunes into means of sustenance does not aid her appeal to the courts of the land to go beyond their defined powers in order to enable her to speculate upon her mother's improbable expectancy of 6.3 years.

The judgment is affirmed.